Our next case is Maris v. EPA, docket number 23-2248. Counselor Reneau, you have reserved five minutes of time for rebuttal, correct? Yes. And I pronounced your name correctly? Yes, you did. All right. Can I ask for the court's indulgence for just two minutes? Good morning, your honors. Good morning. Apologize for my little disorganization here this morning. May it please the court, good morning. I'm here today representing Susan Morris, who a very long time ago, over 10 years now, was terminated from the EPA. Fifteen years, I think, if I'm counting right. I'm sorry? Fifteen years. Fifteen? I know, I did the hearing. That wasn't 2010 when she was terminated? Yeah, yeah, you're right, you're right. Time flies. Well, I suppose a lot of that may be attributable to lack of a quorum at the board. Yes, yes. And then there was a remand somewhere in there. Yes, it sat for a long time, and then there was a ruling that there was no jurisdiction. Yeah. But that was reversed, and we're not here on that. So what we're here on today is whether there is substantial evidence that there is clear and convincing evidence that the decision maker would have proposed her removal, regardless of her retaliatory motive. And so I think it's important to look at it not through the prism of just, is there substantial evidence of, you know, could the evidence go either way, which is the very typical standard for preponderance of the evidence. We have to look at the evidence through the lens of, was it reasonable to think that this is clear and convincing, that even though looking at all three factors, there's a strong motive to retaliate, there's a weak case with the charges, and factor three of the Carr decision, there is no evidence that the EPA has ever terminated or disciplined anyone under similar circumstances. Now you said there's a weak case on Carr factor one, right? Was that the finding below? I didn't think that was the finding. No. I don't think they ever said weak. She never said strong. So you're asking us to, I agree, the word strong was not used. Right. But you're not asking us to reweigh that, are you? I'm asking you to rule on whether, and it's not just charge one, all the charges. Yeah, but I'm just digging into, you used the phrase weak, and so I'm trying to figure out what you're asking us to do with that. That could be just a phrase you used, it's your personal view, but are you asking us to find that it's weak? I don't think you have to find that it's weak. I think you just have to find that it's not strong. And I don't even think, even though there are times when the AJ says that there was evidence and that the case was strong, when she goes through the four charges, well, first you have charge four, everybody agrees is rooted in, or what was the word, anchored in the protected disclosures. Charge four simply says you listed inappropriate information, and the inappropriate information are the disclosures. So the AJ says, well, we'll just disregard that when we're looking at the strength of the case. And I submit that that's wrong. That Carr directs that you look at the strength of the case of all of the charges. And one of the reasons for that is if the decision-maker is putting forth charges that are so questionable, that kind of weakens the case that this is not based on retaliation. Charge one, the AJ doesn't find this, but I submit to you that that is also rooted in the protected disclosures. The thing that upsets the decision-maker about the e-mails and the conference calls is that Ms. Morris is calling her incompetent. She's saying you withheld those MD7s. Well, along with a number of people on the staff, in an e-mail that is sent widely within the agency. Yes. I did not, I'll tell you quite frankly, think of this as a weak case. When I read the e-mails, I was shocked. The kind of language that was used and the kind of accusations that were thrown around, this is pretty strong stuff. I don't know whether you would have fired an employee for doing that, but I would. But I'm not incompetent, and you're not incompetent. Well, I'm sure that there are people who would disagree with that as to me. But it's not just incompetence, but that's pretty bad. But she's been warned to be civil, and those e-mails are not civil. So I'm, I think other aspects of the case are pretty favorable for you, but not, I think, the corpus delicti. The Charge 1. Yes. Right. So there's four charges. Right. Charge 4 is about the protected disclosures. Charges 2 and 3 also have problems. But you're saying that you think Charge 1 itself is strong. I won't concede that, but even if it is, there's problems with all three of the other charges. And so overall, the car factors, I think, dictate that. Not that there's clear and convincing evidence that retaliation was the motive, but there's not clear and convincing evidence that it was not. And that's the standard. The problem with 2 is she charged her with a violation of the Privacy Act and the Rehabilitation Act. She should know what the Rehabilitation Act requires. She charges her with these things even though there's not a legitimate reason to do so. The Rehabilitation Act, you violate that if you disclose private medical information. Well, Ms. Higginbotham herself testified that the information that Ms. Morris disclosed was not private. So it's not a good charge. Charge 3. Can I ask you? Go ahead. From my recollection, is that the administrative judge acknowledged that? She did, but she didn't weigh it as against the agency. Like, okay, so she acknowledges that 2 and 4 are bad charges. But then the case is so strong that it overrides the retaliatory motive. But I think that charge 2 itself shows a retaliatory motive because it's so obviously, like, she couldn't, Higginbotham couldn't honestly believe that Ms. Morris violated the Rehabilitation Act. She's an EEO professional. She should know that Ms. Morris did not violate the Rehabilitation Act by writing what everybody already knows. And at her- Didn't she take the position that she didn't know everybody already knew? No. At the hearing, she said that she just thought it was inappropriate to say. She didn't say that she knew it violated the Rehabilitation Act. There are a number of concessions that Ms. Higginbotham makes in her testimony that the board actually views in favor of her anyway. So it's almost like the A.J. represents the evidence in a light more favorable to the EPA than Higginbotham's testimony does. So I encourage you to read her testimony where she kind of concedes a bunch of things. Charge 3. In the OSC report, the Office of Special Counsel report, they say that charge 3 is not good because it's the misuse of supervisory authority. Ms. Morris says that her subordinate secured a speaker against her wishes and secured the speaker before running it by either her or Ms. Higginbotham. And that's why she removed him from the position. Now, in the OSC report, they say not only does Ms. Morris say that, but there is a letter accepting the speaker position from Congressman Kwesi Mfume saying, I accept. And that letter is before any of the procedures that are supposed to take place take place. We don't have that letter. But I don't think the fact that we don't have that letter should be construed against us because the agency is in the best position to have that letter and to produce it. The OSC report indicates that they saw the letter. And I don't know why that should be disregarded because the OSC report is an official report. They reviewed the evidence. They saw a letter. At the time, there were only two speakers under consideration. The rules require there be three. And Ms. Morris was leaning towards then-Mayor Cory Booker. So for him to confirm Kwesi Mfume is his insubordination. But because he went and complained to Ms. Higginbotham about being removed, she took his side over Ms. Morris's side. Well, the business about going to Ms. Higginbotham and complaining was, I take it, at least one of the reasons that Ms. Morris was unhappy with the subordinate, right? No. Wasn't? No. That's what the other side says. What we say is Ms. Morris was upset that while he wasn't working with his co-coordinator, Elise Wright, and he secured a speaker without doing the procurement requirements, like getting permission, because Kwesi Mfume was more expensive than Cory Booker. I don't remember the precise language that the A.J. used on this, but I thought the A.J. made a finding to the effect that Ms. Morris was upset that the employee had gone to consult with Ms. Higginbotham. She may have made that finding against the evidence of Ms. Morris's testimony in the letter cited by the OSC that that's what Ms. Morris was upset about. Ms. Higginbotham says Mr. King said that that's why that happened, but Mr. King did not testify at the hearing. Am I correct that the failure to follow the MD-715 reports, that that implicated the entire agency? Yes, and what Ms. Morris says in her email. Do you know whether there's been a similar situation like that? Do you have any cases where the particular disclosure involved an abuse of authority or any of those elements implicated the entire agency, tinkered everybody? It's not the entire EPA, it's the entire Office of Civil Rights. Ms. Higginbotham is the director. Ms. Morris contributed heavily to writing the report. The failure to follow those reports affected only the Office of Civil Rights? I thought it also implicated the entire agency as a whole. It's the agency's responsibility to follow the reports, and then the Office of Civil Rights is the office that's delegated to follow the reports and compile the information, and they failed to do that. One of the factors that AJ cites is that I think it's the associate administrator, she says, talked to Ms. Higginbotham, and that strengthens her retaliatory motive. She talked to her about the administrative judge's decision. She mentions that, I don't think it's the administrator, but I think the associate administrator had a talking to with her. Okay, that's all right. Yeah, and I... You're into your rebuttal time. Okay, I apologize. I thought that was my whole time. I just want to also emphasize that the Greenspan case is the most similar of all the cases I found. I'm sorry, which is it? Greenspan versus Veterans Administration. He wasn't so nice either when he was disclosing the incompetence of the director. He publicly, in a public setting, called out the director of the VA for incompetence, and they said the same thing, that it wasn't very nice. Okay, let's hear from the other side. Good morning, Your Honors, and may it please the Court. In this appeal, Ms. Morris presents challenges to two of the Board's findings. However, as we discussed in our briefing, these challenges are nothing more than disagreements with the Board's determinations concerning the weighing of evidence and the credibility of witness testimony. And these disagreements are an insufficient basis to disturb the Board's findings. Additionally, Ms. Morris advances an argument that this Court should apply an incorrect or a heightened standard of review in this case. Now, to be sure, everyone agrees that the standard below was clear and convincing evidence. However, this Court is still conducting a substantial evidence review, which means that the consideration is, would a reasonable fact finder have found clear and convincing evidence in this case? And I think the evidence here clearly demonstrates that a reasonable fact finder could. Specifically, when looking at the evidence that the Board relied on, you know, we've been discussing, you know, the different charges here. Judge Bryson's already referred to the December 2009 emails as documentary evidence that demonstrated Ms. Morris's conduct and why she was charged with what she was charged with. And specifically, the December 11, 2009 email, while it did disclose the failure to file the MD 715 reports, the tone and content of the email goes far beyond this protected disclosure. She accuses Ms. Higginbotham of attempting to execute a personal agenda. She accuses her of fabricating things and making things up, calls her and other employees incompetent. She alleges that the Office of Civil Rights was run as though it were a kindergarten. I mean, these types of statements are far outside and independent of the protected disclosure, and that's exactly what the Board found. Is it pertinent here that Ms. Morris, on prior occasions, had been asked to be civil or had been instructed to be civil in her communications with her fellow coworkers? Is that what creates the unsupported nation? I think I would actually answer that in two parts. I think it's pertinent, but I don't think that in and of itself is necessarily dispositive. The Board, I believe it was the ALJ, specifically referenced that earlier instruction. It was in March 2009 where Ms. Higginbotham had specifically instructed Ms. Morris to behave civilly and professionally in her conduct. But I think it's reasonable to look at what's going on here, that even without that instruction, this type of conduct is clearly insubordinate. I think that instruction just heightens the fact of what was going on here. And as to looking at the charges, there's a couple points I'd like to make here. First of all, this is an IRA appeal, so neither the Board nor this court is reviewing the removal action itself. We're simply looking at whether or not the agency would have taken this action in spite of the protected disclosure, which is a different question. In doing so, though, you'd have to look at the strength of the evidence on the charges, right? And I know that it doesn't have to be strong. That's not the requirement, that there be strong evidence. But it's a weighing of the strength of the evidence, right? It is a weighing of the evidence, Your Honor, but the weighing of the evidence is the Board's responsibility. And that's exactly what the Board did here. And it considered the evidence concerning Charge 4. The Board specifically discusses that and says, yes, we acknowledge that Charge 4 contains a retaliatory intent. But it weighed that finding against what it determined was the non-retaliatory intent of the other charges. Now, granted Charge 2, I think the Board took a little bit more nuanced view, right? It said that there's no retaliatory intent here because this is the charge about Ms. Morris disclosing something that was allegedly confidential about another employee. This is the illness of the employee? Yes, Your Honor. And ultimately what the Board said was that there's no retaliatory intent there, right? It has nothing to do with these MD-715 disclosures, but that the evidence was weak. And therefore, it essentially removed it because it's saying, well, it's not helping the government, but there's no retaliatory intent there. So primarily what we're looking at is Charges 1 and Charge 3, both of which the Board has cited to extensive evidence supporting its determinations on those charges. Now, as to Charge 3, what is, do you think, the crux of the Board's finding on Charge 3? So the crux of the Board's finding there, as I understand it, is that what Ms. — I say Board. I actually mean A.J. Right. Because the Board wrote an extensive opinion itself, but I'm focusing on the A.J. Right. Yes, Your Honor. And I think that what the crux of it there was that Ms. Higginbotham took issue with Ms. Morris' instruction to her employee to not come talk to her, Ms. Higginbotham, right? You know, there was this process where, again, it was the speaker for a special event, and the employee didn't follow the procurement process and was reassigned. He complained to Ms. Higginbotham, essentially jumped the chain, and was reprimanded for that by Ms. Morris. So what Ms. Higginbotham took issue with there was the instruction that Ms. Morris' employees were not allowed to speak to Ms. Higginbotham. And that's my understanding of charge three, which, again, none of that has anything to do with the protected disclosure, and that's what the Board found. So, again, I think that as we detailed in our briefing, for all the charges and all the specifications, the Board goes through and analyzes all of the evidence. This isn't a case where there's an allegation that, you know, there's missing evidence or, you know, that something should have been considered and wasn't. The allegations that Ms. Morris is bringing in this appeal are purely focused at the Board's weighing of evidence and credibility determinations. And repeatedly, this Court has stated that those types of determinations are the purview of the Board. If the Court has no further questions, I would respectfully request that this Court affirm the determination. Thank you. We thank you, sir. In Ms. Morris' December 11th email, which my friend on the other side said is evidence supporting charge one, yes, she accuses Ms. Higginbotham of trying to execute a personal agenda, of trying to cover up incompetence and managing the office like a kindergarten. Maybe it's worded a little rudely, but it is still rooted in the protected disclosure because she then says, I now understand why you have refused to approve the MD-715 reports to be submitted to EEOC and have kept the administrator, so that answers the other question, in noncompliance for your own ends. So she is accusing her kind of a fraud that you're withholding those reports to cover up all of your mismanagement and all of the things that are going on. So the obnoxious and rude things that counsel points out that she said in the two emails are all in support of her protected disclosures. Not all, right? You say they were all in support of her protected disclosures. How about her attacks on the other employees? X sleeps at his desk all day, Y plays video games the whole day. I mean, those have nothing to do with the 715. Well, they have something to do with Ms. Higginbotham mismanaging the office and trying to cover up that mismanagement by not submitting the 715s. That seems to me something to stretch. Okay. I don't think it's a distraction. I know that Ms. Morris is more generally complaining about her mismanagement of the office, and that is in the OSC report. There's a footnote dropped in the OSC report that indicates that all of these things contribute to the mismanagement of the office, and that essentially Ms. Morris is accusing Ms. Higginbotham of mismanagement and incompetence. There's really not a nice way to say any of that, so that's why I think it's important that we look at the Greenspan case, where he also accused his boss of incompetence. And there is missing evidence here. The Emplume letter accepting the speakership is missing, and evidence of other employees who have been disciplined for being rude or not being civil is missing. I'm sure there are other employees in the EPA who have been rude and uncivil who probably got a letter of recommend or something, but we don't know that because they produced no evidence in support of CAR Factor 3. You referred a couple of times to the Greenspan case. I don't think you cited that in your brief, and I've seen the case, but I don't remember what the site is, if you have the site. It's in our reply brief extensively. It's also in the OSC report. I can give you the site. I have it here. It's 464 F3, 1297. Oh, I didn't see it in the table of cases in your reply brief, but maybe it's there. I don't see it either. Did we forget that? Oh, you're right, it's not in the table of cases. That might be one that I found after the briefs, but it's in the OSC report, and it is completely on point. The doctor there. No, it's not in the table of cases for the petitioner's brief. I apologize, Your Honors. I've been focusing on that case. Well, we have it now. You have it now, but I also did want to point out. Council said there's no missing evidence or evidence that wasn't considered, and it was not considered that there are no comparators. And I think that would be important evidence that the agency would be in possession of and would want to show, except that it may likely show that people were not disciplined as heavily as Ms. Morris was. Ms. Morris was very upset about the MD-715 reports and the mismanagement of the office, and she did think that Ms. Higginbotham was doing all that to cover up her personal agenda. She did believe that. There's really not a nice way to say that. But Greenspan does say that that is part and parcel of a protected disclosure. It's going to be obnoxious. Well, I just think it seems to me the biggest problem is not so much what she said, but saying it to the entire group. That's what troubles me. That's why it's a disclosure. Well, but why not give it to the inspector general of the agency or something like that? She did go to the inspector general. Did she? All right. But if she did, then she's made the disclosure in that fashion. Why does she need to have an email that's spread throughout the office? It just strikes me as being above and beyond, basically just venting. She's agitating for what she thinks is really egregious abuse of authority and wrong. The MD-715 reports, two years they didn't go in to the EEOC. That was her main job, was producing these reports and making sure that the agency was following the EEOC guidelines. She thinks that Ms. Higginbotham didn't. When you say agency, you're talking about the EPA, right? Or just the office? The EEO office. Well, if the EEO office isn't doing its job of making sure that anti-discrimination rules and regulations and laws are followed, I do think that the whole agency is implicated. Did anything come of her report to the inspector general? You say she had reported to the inspector general. Yeah. I think she reported anonymously. I don't think anything came of it. I know that they submitted the MD-715 reports in later years. Okay. All right. We thank you for your argument. We thank all the parties for their argument.